Citation Nr: 1829736 
Decision Date: 07/25/18 Archive Date: 08/02/18

DOCKET NO. 14-32 096A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Decatur, Georgia


THE ISSUES

1. Entitlement to service connection for gastroesophageal reflux disease (GERD).

2. Entitlement to service connection for erectile dysfunction.

3. Entitlement to service connection for gout.

4. Entitlement to service connection for a cervical spine disability.

5. Entitlement to service connection for peripheral neuropathy of the bilateral upper extremities, to include as secondary to service-connected lumbar spine disability and/or claimed cervical spine disability.

6. Entitlement to a rating in excess of 10 percent for lumbar spine disability.


ORDER

Service connection for GERD is granted.

Service connection for erectile dysfunction is granted.

Service connection for gout of the right great toe is granted.


FINDINGS OF FACT

1. The Veteran's GERD is commenced during military service.

2. The Veteran's erectile dysfunction commenced during military service.

3. The Veteran's gout of the right great toe commenced during military service. 


CONCLUSIONS OF LAW

1. The criteria for service connection for GERD have been met. 38 U.S.C. 
§§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303 (2017).

2. The criteria for service connection for erectile dysfunction have been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303 (2017).

3. The criteria for service connection for gout of the right great toe have been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from June 1986 to September 1986 and January 2005 to May 2011.

This matter is before the Board of Veterans' Appeals (Board) on appeal from a July 2012 rating decision of the Department of Veterans' Affairs (VA) Regional Office (RO) in Guaynabo, Puerto Rico. Jurisdiction of this matter currently resides with the Atlanta RO in Decatur, Georgia.

In April 2017, the Veteran testified at a Board hearing before the undersigned.

I. Service Connection

Service connection will be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. § 1110; 38 C.F.R. § 3.303.

Establishing service connection generally requires evidence of (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the current disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection may be granted for any disease diagnosed after discharge, when all of the evidence establishes that the disease was incurred in service. 38 C.F.R. 
§ 3.303 (d).

When there is an approximate balance of positive and negative evidence regarding any material issue, reasonable doubt will be resolved in favor of the claimant. 38 U.S.C. § 5107; 38 C.F.R. § 3.102.

A. GERD

The Veteran testified that he has had GERD since service, which manifested with symptoms of heartburn or burning in his esophagus. 

Service treatment records show that the Veteran presented with a complaint of heartburn, which was treated with over-the-counter medications. A December 2008 medical report shows that the Veteran had a history of GERD, which was well-controlled. An October 2010 Medical Evaluation Board (MEB) Summary report shows that the Veteran continued to take Nexium to control his symptoms. The Veteran has testified that he has been taking Nexium since then.

The Veteran was afforded an August 2011 VA examination. He reported having heartburn. An upper GI series was performed, which revealed normal results. The examiner found that there was no current diagnosis of GERD. 

However, since the August 2011 VA examination, a November 2016 VA treatment record shows that the Veteran has been diagnosed with GERD and prescribed Nexium. 

A veteran is competent to testify as to the onset and frequency of symptoms that are observable by a layperson, such as heartburn. Layno v. Brown, 6 Vet. App. 465 (1994). There is no probative evidence which contradicts the Veteran's assertions that his GERD started during military service; thus, the Board finds his statement as to the onset of his GERD to be of significant probative weight. 

The record shows that the Veteran was treated for GERD in service, with a credible report of ongoing complaints of and treatment for such after service. Records reflect a current diagnosis of GERD. Given the credible statements from the Veteran regarding the onset of and continuing nature of his symptoms, the Board finds that after resolving any benefit of reasonable doubt in favor of the Veteran, the evidence is at least in equipoise as to whether the Veteran's GERD commenced during military service. It follows that entitlement to service connection for GERD is warranted. See 38 U.S.C. § 5107 (b); 38 C.F.R. § 3.102.

B. Erectile Dysfunction

A December 2008 service treatment record shows that the Veteran was diagnosed with and treated for erectile dysfunction. The October 2010 MEB Summary report shows that the Veteran reported having erectile dysfunction, which the examiner indicated may be due to side effects of medication taken for his lumbar spine disability.

Following August 2011 VA examination, the examiner found that there was no pathology to render a diagnosis of erectile dysfunction.

However, the Veteran has testified that he continues to experience symptoms of erectile dysfunction and that he has taken several medications and used injections to no avail. Indeed, an August 2016 private treatment record reflects a diagnosis of erectile dysfunction.

Based on the medical and lay evidence of record, showing a current diagnosis of erectile dysfunction that began during service, the Board finds that the Veteran's current erectile dysfunction is the same disability that he credibly reported began during service. Therefore, this evidence suffices to establish a nexus between the current erectile dysfunction and the Veteran's service and the Board finds that after resolving any benefit of reasonable doubt in favor of the Veteran, the evidence is at least in equipoise as to whether the Veteran's erectile dysfunction commenced during military service. See 38 U.S.C. § 5107 (b); 38 C.F.R. § 3.102.

C. Gout

Service treatment records show that the Veteran was diagnosed with gout of the right great toe after abnormal uric acid levels were detected during laboratory testing. The October 2010 MEB Summary report shows that the Veteran reported right great toe soreness with pain and swelling. Treatment included Allopurinol with improvement. 

During the August 2011 VA examination, the Veteran reported symptoms of pain in the right great toe, left wrist, and elbow, which he attributed to gout. Following examination, the examiner found that there was no pathology to render a diagnosis of gout. 

However, the Veteran has since testified that he has had gout in the same joint of the right great toe as noted in service. Indeed, a November 2016 VA treatment record shows that the Veteran has been diagnosed with gout and prescribed Allopurinol.

The Veteran is competent to report continuous symptoms since service, see Washington v. Nicholson, 21 Vet. App. 191, 195 (2007), and the Board has no reason to question his credibility. Therefore, given the diagnosis of gout of the right great toe in service, the competent and credible lay testimony of symptoms associated with gout of the right great toe during and since service, as well as the objective evidence of a current diagnosis of gout of the right great toe, the evidence is at least evenly balanced as to whether the Veteran's current gout of the right great toe had its onset in service. Thus, the Board finds that service connection for gout of the right great toe is warranted. See 38 U.S.C. § 5107 (b); 38 C.F.R. § 3.102.

With respect to gout in any other joint, to include the left wrist and elbow, the Board finds that service connection is not warranted. Other than the Veteran's bare assertion that he has gout in his left wrist and elbow that are related to service, there has been no other evidence submitted which discusses any diagnosis of gout in any other joint, to include the left wrist and elbow, nor evidence of a link between gout of any other joint and his military service of any kind.


REMAND

Cervical Spine Disability

Service treatment records show that the Veteran presented with neck pain, which was treated with physical therapy and a neck brace. The October 2010 MEB Summary report reflects the Veteran's complaint of intermittent neck pain, which he treated with medications and use of a neck brace. A September 2010 MRI of the Veteran's cervical spine revealed no evidence of significant disc bulge, protrusion, canal farominal stenosis, or soft tissue abnormalities. Physical examination resulted in a diagnosis of cervical degenerative disc disease with cervicalgia and decreased range of motion. The examiner stated that upon reconciliation of apparent inconsistencies, the radiological evaluation currently did not indicate any significant bulging discs, but prior study was abnormal per neurosurgery. The examiner indicated this could be referred pain from the Veteran's multiple lumbar spine complaints with associated muscle spasm. During the August 2011 VA examination, the Veteran reported stiffness, spasms, and decreased motion. However, x-ray testing of the cervical spine was normal and the examiner diagnosed the Veteran with cervicalgia. 

Since the August 2011 VA examination, the Veteran has submitted a November 2015 private treatment record noting an MRI result of multi-level spondylosis of the cervical spine.

Based on the above, the Board finds that the Veteran ought to be afforded a new VA examination to clarify whether he has a current cervical spine disability and, if so, whether it is related to service.

Peripheral Neuropathy of the Bilateral Upper Extremities

The Veteran has asserted that he has peripheral neuropathy of the bilateral upper extremities that is secondary to his service-connected lumbar spine disability. He further testified to symptoms of tingling in his fingers and numbness, as well as tingling radiating down his arms. 

Service treatment records reflect complaints of tingling in the arms and bilateral hand discomfort related to his cervical spine. 

Neurological testing of the bilateral upper extremities, conducted during the August 2011 VA examination, was normal with no evidence of sensory deficits or diminished reflexes. The examiner found that there was no pathology to render a diagnosis of peripheral neuropathy of the bilateral upper extremities.

A November 2015 private treatment record shows that the Veteran presented with a complaint of recurrent right arm pain that had been problematic over the past several years. He also reported some numbness and tingling in his right hand. The examiner noted that the Veteran presented with a compressive cervical radiculopathy, more likely involving the C6 nerve root on the right. He was prescribed a soft cervical collar and Naprosyn 500mg twice daily.

Although the Veteran has asserted that he has peripheral neuropathy of the bilateral upper extremities as secondary to his service-connected lumbar spine disability, the evidence shows that he may have neurological manifestations related to his claimed cervical spine disability. Based on the above, the Board finds that the Veteran ought to be afforded a new VA examination to clarify whether he has any current neurological manifestations secondary to a cervical spine disability and/or his service-connected lumbar spine disability.

Lumbar Spine Disability

The Veteran testified that his service-connected lumbar spine disability has worsened since his last VA examination in August 2011. Thus, a remand is necessary to obtain a new VA examination. See Palczewski v. Nicholson, 21 Vet. App 174, 181-82 (2007); Snuffer v. Gober, 10 Vet. App. 400, 403 (1997).

Accordingly, the case is REMANDED for the following action:

1. Obtain any outstanding VA treatment records. 

2. Schedule the Veteran for an examination to determine whether any cervical spine disability is related to military service.

The physician should clearly identify any current disability or disabilities affecting the cervical spine, to include multi-level spondylosis as shown in a November 2015 private treatment record.

The examiner is asked to reconcile, to the extent possible, findings in the August 2011 VA examination report with respect to whether the Veteran has a current cervical spine disability with the 2015 diagnosis of multi-level spondylosis. 

Then, for each identified disability, the physician should provide an opinion as to whether it is at least as likely as not (50 percent probability or more) that any current cervical spine disability is related to the Veteran's military service, to include the Veteran's documented complaint of neck pain.

3. Schedule the Veteran for a VA neurologic examination. 

The examiner should identify/diagnose any neurological disability of the upper extremities that presently exists or has existed during the pendency of the appeal.

For any neurological disorder found, to include any peripheral neuropathy of the bilateral upper extremities, the examiner should opine whether such disorders at least as likely as not (50 percent or greater probability) began in or is otherwise the result of his military service, to include his complaints of tingling in the arms and bilateral hand discomfort related to his cervical spine.

Then, for any neurological disorders which are not found to be directly related to military service, the examiner should opine whether such neurological disorder is at least as likely as not either (a) caused by; or (b) aggravated by the Veteran's service-connected lumbar spine disability and/or his claimed cervical spine disability. 

The term "aggravation" means a worsening of the underlying condition beyond the natural clinical course and character of the condition due to the service-connected disability as contrasted to a temporary worsening of symptoms.

If aggravation is found, the examiner must attempt to establish the baseline level of severity of the Veteran's neurological disorder prior to aggravation by the service-connected lumbar spine disability and/or his claimed cervical spine disability. 

4. Schedule the Veteran for a VA examination to determine the current severity of his lumbar spine disability. 

If possible, such examination should be conducted during a flare-up.

The examiner should identify the current nature and severity of all manifestations of the Veteran's lumbar spine disability.

The examiner should record the range of motion of the lumbar spine observed on clinical evaluation in terms of degrees. If there is evidence of pain on motion, the examiner should indicate the degree of range of motion at which such pain begins, as well as whether such pain on movement results in any loss of range of motion. The examiner should record the results of range of motion testing for pain on BOTH active and passive motion, AND on weight-bearing and nonweight-bearing. If the examiner is unable to conduct the required testing or concludes that the required testing is not necessary in this case he or she should clearly explain why that so.

If the Veteran endorses experiencing flare-ups of his lumbar spine disability, the examiner must obtain information regarding the frequency, duration, characteristics, severity, and/or functional loss related to such flare-ups. Then, if the examination is not being conducted during a flare-up, the examiner should provide an opinion based on estimates derived from the information above as to the additional loss of range of motion that may be present during a flare-up due to functional loss. 

If the examiner cannot provide an opinion as to additional loss of motion during a flare-up due to functional loss without resorting to mere speculation, the examiner must make clear that s/he has considered all procurable data (i.e., the information regarding frequency, duration, characteristics, severity, and/or functional loss related to such flare-ups elicited from the Veteran), but any member of the medical community at large could not provide such an opinion without resorting to speculation. Failing to provide an estimate solely because the examiner could not observe the Veteran during a flare-up will be deemed an insufficient reason for failing to provide the estimate. 

All findings should be reported in detail and all opinions must be accompanied by a clear rationale.

5. Finally, after conducting any other development deemed necessary, readjudicate the appeal. If any of the benefits sought remain denied, issue a supplemental statement of the case and return the case to the Board.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).



______________________________________________
M. HYLAND
Veterans Law Judge, Board of Veterans' Appeals

ATTORNEY FOR THE BOARD S. Gordon, Associate Counsel

Copy mailed to: Disabled American Veterans

Department of Veterans Affairs